May it please the Court, Edward Reinitz for Appellant. I'd like to focus my discussion for our appeal on the enablement question. With respect to the four Promega patents, they've claimed open claiming at the point of novelty. And what's the most important thing I think to understand and appreciate for evaluating our enablement position is that the claims as drafted encompass huge swaths of subject matter including many, many multiplexes that use nothing in the invention, nothing invented, learn nothing from the disclosure, zero. And what's important to understand is the role of primers. For each locus to be amplified, you have to have primers that bookend it and there's any number of primers that can be used. Finding primers that work for one locus is easy. Finding primers that work in a multiplex where you have multiple loci being amplified at the same time is very, very difficult because it's completely unpredictable and the record's unanimous. Mr. Reinitz, could we just, to make sure I understand the playing field here, could we just go through one claim and then you explain to me in that one claim what the understanding or what the construction of that claim is that you want to point at as a problem on enablement? Like say claim 16 of the 660, do you have that? I was going to use claim 1 of the 235 patent which is what Promega selected as the one that they thought was the one they wanted to rely on to show that they weren't covering some subject matter. That was the only one they cited in their brief. All right, so claim 1. So it's a method of determining the alleles present and you obtain the DNA sample and then you select a set of loci which is step B and there's a list there. And the construction was that the set of loci was open which is that the set of loci could include other non-listed loci. It just could be any number of loci. And then you co-amplify that in a multiplex amplification reaction which is one reaction that's a liquid reaction and then you create a mixture of amplified alleles. So step B, we should just sort of look at step B and all those terms there and just say, we could almost just convert all that and say any loci, any loci? No, say this plus any loci. So this plus. And the issue is that once you add one more locus, okay, so if you have a triplex and you make it a quadplex, the primers that you use for that fourth locus might conflict with the primers in the original three loci and then it doesn't work. And everyone agrees the record's unanimous but that's completely unpredictable. Promega's position is it's an invention to come up with that quadplex and add that one more. So what's important to understand is that their patents disclose essentially one primer pair, sometimes more, for each combination that work. But if you add a fourth locus, a new one, a fresh one, it may make you have to redo all the primers for every single one because it's unpredictably difficult to come up with a set that works together. And if Promega got the patents by saying, because they have a triplex and they replaced one locus and just basically built on a duplex, and they said, well, every time you add a new primer, it's a new invention because you, a new locus, excuse me, it's a new invention because those primers might be more, might conflict with the existing multiplex. And you start from scratch. So every time that you add a new locus, you have to add new primers into the mix and you may start from scratch. And it's Promega's position that as the number grows, it's even more difficult. So if you have an eightplex and someone gives you an eightplex with working primers, you create a new locus, there's a good likelihood, it's completely unpredictable, whether your primers will work. So the claim covers an eightplex, an 80plex, an 800plex, an 8 millionplex? Right. And not only that, and then that's just under MagSale, that's straight not enabled to my mind. I mean, you can't just, it can't be that the teaching that you need to include for a threeplex is the same as for an 80plex. And you get the, you just get the expanded coverage. But the important point is, if you may take a threeplex and you add a new locus and the primers conflict, and it's completely unpredictable, and it's likely that'll happen, you might have to use all new primers, which is trial and error testing, and you learn nothing from the patent. You don't even get to use their primers from their original triplex or whatever that worked. But Mr. Reines, every patent claim that's ever been issued uses the word comprising. And it's every patent claim that's been issued is an open-ended claim. Right, clearly. And so we need some kind of limiting principle if we were to go your way. Right. So there's at least two. Clearly, I'm not, that's not our position. Our position is if you open claiming at the point of novelty, this is not, we're not referring to comprising in the preamble. This is comprising on this set, and it's step B. So it's just talking about one element. It's talking about that. It's referring to that one specific thing. And then it's open, but the point, the whole point of the invention is that we can get a multiplex to work, and it's completely unpredictable. You have to look at the facts of each case. What to me, there's two principles. One is open claiming at the point of novelty is inappropriate. If you, especially where here, you could have claims, multiplexes encompassed, where you get nothing from the invention. Do we have a case that says that? Well, I think the best case, certainly the closest case to this in any sense is Magsill. None of the cases cited by the other side relate to these kinds of questions. That claimed range, that open-ended claim range, was the point of novelty, Magsill? Yeah. Yeah. Fortunately, I argued that case. I'm pretty conversant. Were you on the winning side? Yes, I was, Your Honor. Fortunately, made the stars align again. Can I ask you some process questions? Of course. To get it straight, which is that the district court obviously granted summary judgment of enablement. Did you move for summary judgment of non-enablement, and did you rule on that motion? I don't believe so. So, what's before us? I mean, you're asking for a reversal. I think a reversal, but, you know, I want to double-check. I'm sorry. With all the motions that were flying back and forth, I'd have to just reconfirm, but I think that we were... I just have to check. I apologize. Okay, because we've been through this before. Let me ask you also, assuming that we were to agree with you on the enablement, or even on the obviousness, my understanding is we still need to reach the cross-appeal issues on the totes patent. Yes. Is that correct? Yes, Your Honor. It changes the issues, but we do have to reach that. Okay. And then you say something in your yellow brief, which was that regarding the totes patent, you say that the district court summary judgment grant of validity of PROMEGA's patents deprived life the benefit of its totes-specific license protections. I didn't understand what that meant. The license rights that we have to tout are broader than the rights that we have to the PROMEGA patents, cell line authentication being the most significant and important. For cell line authentication, which is used now in research commonly, we retain that right in a 1996 license. It's undisputed, but complex, all the back and forth of the rights. But in touts, originally touts was one of life's ancestors, and it was actually conveyed to PROMEGA through a complicated chain. But we retain those rights. The PROMEGA patents come in the 2006 agreement. We don't have retained rights there because we never owned them originally. All right. I remember something about Maxill being about kind of a marginal improvement over the prior art, whereas arguably these inventions were significant contributions over the prior art, and maybe there's a distinction to be made there. Maxill was not, and certainly that was not the position of the patent holder there. The claimed range was actually the novelty, was that you could reach these new numbers, this new range in terms of the capability of the system. Here it's very incremental. If they took a triplex and they took one locus out and put one locus in and made a new triplex and had a specific set of primers, only one pair of primers for each, and they want to cover every pair of primers working with that and every plex that comes up, even if you have to start from scratch. If you get no value from the invention whatsoever from the patent, you're not using their primers. That's outrageous. When you put a new set of primers in, it can conflict with the existing working primers. That's their point as to why their patent's inventive in the first place. Mr. Waxman says you only have to enable unrecited elements. I mean recited elements, not unrecited elements. That goes to the claim, set is a recited element, it's one of the set. Multiplex amplification reaction includes all the loci, it's claimed. It's encompassing all that. That was their position. They used the word, and we document this in our brief, they used the word that this encompasses all these broader multiplexes, and it's claimed. It's a set of loci. It may not be expressly stated, but it's encompassed, which is what matters. I want to make sure I save time. We're looking at the claim construction a little more than just the words of the claim, I guess is what you're saying. No, I mean if I've got time, I'm just worried because I have an important appeal. No worries. Okay, thank you. This is important stuff. Okay. The SEPI is selecting a set of loci, and then there's a list. That set of loci includes, that was the debate, was that open or closed? That was the claim construction put to Judge Crabb, and she said it's open. The set includes not just these, but all the loci that you want to add. In some of their patents, it's a triplex. If you add 10 more to a triplex, the set is 13. And no one's challenging that claim construction here. No one's challenging the claim construction. And then in the co-amplifying, the multiplex amplification reaction has to be all the, that's where they just, to my mind, that's where they just lose. They can't say the multiplex amplification reaction is just three of the 10 loci that are being co-amplified. The way I look at it is each multiplex is its own system. It's a system because you have this crosstalk that's unpredictable between the primers of one to the other. So each one's its new own thing. It's not just an incremental build from the prior one. That's their position. That's how they got the patents. So how can it be that when it comes to enablement, they cover every possible multiplex building on theirs, even though if you add in 10 more, you're going to have primer conflicts. You're going to have to throw out their primers, which is all the work they did, the only work they did, create new primers, and then you're infringing? That doesn't make any sense. Now, their argument, to be fair, on the claim construction is that, well, the set that they're picking is just the set of the enumerated ones, and the set that they can draw a claim chart that doesn't include yours. I think that's not what was intended by an open set. An open set means the set can encompass more, and that's the way they argued it. I think they lose on that. But step C trips them up on that because I don't think there's a way to look at the multiplex amplification reaction as being some of the reaction. I mean, it's a mixture of all these primers and all these oligonucleotides. All right. Thank you very much. I appreciate it. So you were almost four minutes into your rebuttal. We'll restore the rebuttal time of seven minutes, and we'll add another four minutes to Mr. Waxman's time. Keep it even. May it please the court. Because, as Judge Prost noted, there's no challenge to the validity of the Tout's patent, which actually is the pioneer patent on STR loci, multiplex amplification, and because there's no dispute that all of the accused kits read on Claim 42 of the Tout's patent, I'd certainly like to spend most of my time on the issues in our cross-appeal, but I do want to address the nature of the two questions that Judge Prost and Judge Chen were asking. First, as to your question, Judge Prost, about this different license privileges as to the Tout's patent, let me just say this. This is an issue that they have raised and that comprises two sentences on page eight of their reply brief. It is not an argument that they made to the district court. It is not an issue that they raised in their opening brief. They have not even graced the court with the 1996 license agreement in the appendix. There are three pages of the 1996 agreement in the appendix to which they refer to none of them in their two-sentence discussion, and so the issue is utterly waived. They raised a different issue with respect to their license right at summary judgment. The judge found it insubstantial and ruled against them, and they didn't appeal it, so that the issue of the scope of the 1996 license is not before this court. What is before this court is their argument about enablement on the Promega patent in the case, not the Tout's patent. And, Judge Chen, you were suggesting as an exemplar claim something from, I think, Claim 4 of the 660 patent, and we've had a long discussion about the 235 patent, which in Step B uses the term comprising. I just want to point out for the court that there also is infringement of the 660 and 598, which use the words consisting of, not comprising. And so even if you were to agree with my friend that consisting of somehow left the 235 Claim 1 type patent unenabled, you would still have the Tout's patent and the 660 and 598. But in any event, they are wrong about this, the argument that 235 Claim 1 is not enabled, and that's because… Mr. Waxman, before you go there, just so I understand, you're saying that there's claims in your other patents that don't use the word comprising, but that use consisting of. Correct. And so that suggests that those would be closed sets. But I thought the district court judge, for whatever reason, right or wrong, and that's not disputed on appeal, construed all of the claims to be open-ended claims. All of the claims, you're correct. Regardless of whether the magic word is comprising or consisting of. That's correct. And the reason with respect to the 660 and 598 is that she also construed Step C, which is not challenged, the claim constructions are not challenged on appeal. She said that even in the 660 patent where Step B says consisting of, Step C, which recites a mixture, is open-ended. And the mixture can include the closed set of loci that are enumerated in, that are recited in Step B and also any other loci. But let me go to the comprising step, the Claim 1 of 235. The other loci in this case are, in fact, what this court has referred to repeatedly as unrecited claim elements. And the issue in Magsil was a recited element of open scope. So, for example, in Magsil the claim, it was actually a claim to, it had a comprising of claim, but one of the things that was involved was an electrical junction that exhibits a resistance change within a specified range. And it was construed to be a resistance change between 10 percent to infinity. What the court in Magsil, the court in Magsil found no enablement, but not because of the consisting of open language. What it found was that the claim to the electrical junction was not enabled because the inventor disclosed only a means to get an electrical resistance change between 10 and 11.58 percent and not to infinity. And therefore, in contrast to this type of case where our claims don't care whether you do other things in addition to creating, to multiplex amplifying the 13 loci in patent, the 235 patent Claim 1, which correspond to the FBI CODIS loci, the patent, the invention is practiced if you multiplex amplify those 13. The patent claim is indifferent to whether you also multiplex amplify another locus. And in that regard, this case is very much like the hypothetical this court addressed in A.B. Dick where somebody who obtained a patent on a pencil or a patent on a writing instrument comprising, you know, a column of graphite clad in a column of wood that is tapered at one end doesn't have to recite the fact that there also could be an eraser or there could be a mechanical machine that uses the pencil. Those subsequent inventions may be patented, but they also… Why isn't this a little bit more like Magsil in the sense that, as I understand it, the understood to be selecting a set of loci of the DNA sample comprising at least the following and then anything else that counts as an STR? Here's the reason, Judge Chen. But isn't that the way she construed it? Well, no. What she said was, she said the claimed invention, and after all, enablement is, you know, Section 112A, the enablement requirement is whatever will enable a posita to make or use the invention. And what she said correctly is that the invention are those elements that must be present to practice the claim. And the use of comprising to include unrecited elements is to prevent somebody who practices the invention but then adds something else onto it from claiming that there is, in fact, no infringement. As, for example, the person who invents the eraser to go on the pencil does get a patent for that but can't practice his own invention unless he's licensed by this person. And the important difference, I think, between your hypothetical, and it does illustrate, I think, the difference between this case and Maxill, which was a disclosed element with open scope, is if they do a 14th, 15th, or 16th locus, and understand here these loci have no relation to each other. They're on different chromosomes. They're not part of a range. That's what makes them useful. They can get a patent on it if it's a non-obvious extension. If we were to claim these 13 and everything else in HEC-VRBA, we would be, in fact, blocking them from getting a patent when they discovered the 26th locus, whereas this doesn't. And in Maxill, the question was, somebody comes along and has a device that uses the electrical junction that exhibits a resistance range of 600 percent, and that actually was the issue in Maxill. The problem was not, this wasn't something that was in addition to practicing the recited elements. This was a substitute range that was claimed. So somebody who comes along and says, I've discovered a way to do the electrical junction at 600 percent, is reading on the claim and is infringing the claim, and can be blocked if the claim is valid. And that's the substantial difference in this case. If the judge construed this claim, or the court construed this claim, to cover any and all set of loci, then do you agree there's an enablement problem? I do if what the court understands by that terminology to mean that nobody who comes along and adds other loci to the disclosed set can get a patent on it. Then it would be a claimed element. In other words, in Maxill, and the same thing was true in Wyeth versus Abbott Laboratories, where the claim was to a process comprising the use of rapamycin. And what the court said was, there's no enablement problem with comprising a number of steps, including the use of rapamycin. The enablement problem is that rapamycin is a class of compounds that includes millions of different varieties, and the only disclosure is to a particular kind called sirolimus. And there is no teaching in the specification about what the particular characteristics of sirolimus are that could be extrapolated to the millions of other forms of rapamycin. Before your clock runs out, if you feel like you've gotten it, I just want to make sure you turn to your cross appeal. Thank you very much. Our cross appeal focuses on three points. U.S. infringement, damages, and 271F. Number one- Can you start with 271F, please? Sure. As to 271- You need to win on both prongs. You decided for two alternative reasons, you go down on 271F, right? In order to restore the judgment of infringement as to non-U.S. sales, we need to win on both. But in order to get a new trial on 271F, we only need to win on either one. We only need to win on the proposition that by exporting these products to U.K. employees working for a foreign division or subsidiary satisfied the inducement prong. Because the evidence showed, and the judge agreed, and in their J-Mall opposition, they agreed, the evidence proved that all of the identifiler kits, which comprised 44% of their worldwide sales, were comprised of multiple components sent from the United States. Not just Taq polymerase, but also the primers. And therefore, because substantial portion is a jury question, all she said- So this is on the inducement of yourself, right? That's the- Okay. Yes. Let me ask you, since you're intimately familiar with Akamai as well as this case, it seems to me your argument- I'm getting there. It seems to me your argument there is very much related or presumes, as it should, that the Supreme Court is not going to mess around with what the Federal Circuit said in its majority on inducement. Am I correct about that? And if so, does that leave us some question about whether or not we ought to hold off on this to the extent- I very much hope, and I would hope that you hope, that I am able to defend this court's en banc jurisprudence in Akamai, notwithstanding differing views among the en banc court. But our argument here doesn't depend on it at all. Okay. So tell me about the inducement in the absence of what we said in Akamai. Sure. As we pointed out, they raised this issue of 271F in their Rule 50 motion. And in response to the Rule 50 motion, we said, first of all, there is no bright-line rule that a single component cannot be a substantial portion. But in any event, this case involves life employees exporting a component and components for various kits to employees of a foreign division or subsidiary. And we cited to the court, I think it's on page 44 of our red brief in this case, decisions of this court and others that say whether or not somebody can induce themselves, and we think they certainly can, inducement of corporate employees or inducement of a foreign or a distinct subsidiary or division is actionable inducement under even 271B, much less 271F. Inducement means, and I do think that regardless of whether one believes this court was right or not in Akamai with respect to B, inducement means to cause, particularly when you're talking about inducing something like inducing vomiting or inducing labor, inducing a combination, which is the language of 271F1, means to cause that. And there is no reason why, there's no reason to support the bright-line rule that Judge Crabb articulated that you cannot induce yourself to do something, in fact, or induce something to be done. We'd be the first ones to say that though, right? There's no Federal Circuit case that says you can induce yourself. where if you're the one that's practicing the invention, if you've induced yourself to practice the invention, you're directly liable, not just indirectly liable, and that cognate situation doesn't exist in 271F1. So you're suggesting the word induce can mean different things in 271F1 compared to 271B? We think it means the same thing. It means cause, and inducing under 271B can include inducing an employee, as this court held, or inducing a subsidiary or a division. But even if this court were to rule that somehow it doesn't mean the same thing, you would have to take into account the context in which 271F was enacted, which was, what are we going to do about the failure of the patent laws to address a situation, exemplified in Deep South, where somebody has a combination, there was a combination patent in that case, a combination patent, and simply ships it in pieces overseas for combination overseas. And under that circumstance where there is no A liability, where the liability can only exist under an inducement. Some might say that what we're going to do about that, the we is the wrong we, and if something's going to be, if there is a gap in the law that allows someone to go forward with something that's a policy matter that we think is improper, that's left to Congress and not to the courts. Our position is simply this. First of all, there were $311 million in documented foreign sales as to which multiple components were supplied from the United States, and therefore the substantial portion question is a jury question, and it was presented to the jury. But if you are simply looking at the court's bright line rule, you are correct that if you characterize it as, well, should we, the federal circuit, fill a loophole, that's for Congress. But this isn't a situation in which the court is filling a loophole. The Congress has filled a loophole. They are asking for a super narrow construction of Deep South in which the thing that matters is whether your foreign subsidiary does the combination or whether you ship it directly to your customer for purposes of doing the combination. Now, I apologize. I skipped you to part three, and I know your time's running out, but I know this was just the third of two, so you want to briefly, briefly touch on the first two. If we go over, maybe we go over a little. How did 271F1, the theory of liability, creep up in this case? As I understand it, your summary judgment motion was about 271A and 271B, and then we run to a damages trial, and then what happened? Judge Chen, creep up is exactly the right word. And that was you guys that were the creepers, right? Au contraire. My friend may say differently, but here is what happened. We filed the lawsuit. At the time we filed the lawsuit, we didn't know that some or all of these products were combined overseas. We had discovery requests to life that would have brought this information forward that had not been completed at the time we filed our summary judgment motion. So we moved for summary judgment of infringing on the made, used, sold, offered for sale. We introduced evidence of instances of every single kit being sold in the United States for a non-licensed purpose. Their defense was not, whoa, whoa, whoa, these things are made overseas. Their defense was not, these things aren't infringing. Their defense was, we have a license, and our license privileges us to do these sales, and that is the issue that the court decided when she granted summary judgment of direct 271A infringement. A few days before trial, we get these documents that show that they have a facility in Warrington, UK, in which they assert all of these kits are being combined. The case goes, there's an opening statement by Light's lawyer that tells the jury at the outset, infringement, there's no question that infringement has occurred. The issue for the court, for you, is the amount of damages that are due. There's no question that infringement has occurred, and there's no question that Promega is entitled to be compensated for that. The question for you is how much those damages are and whether we act unwillfully. At the time of the rule, their first Rule 50A motion, they bring up this issue of F1 and say, we're entitled to this because our kits were made in Warrington, and there's no basis for F1 liability for the reasons that the judge originally disagreed with them and sent it to the jury on F1, but then post-trial, agreed with them and vacated and granted them an injunction. So, yes, it's not integral. So you're saying that the judge clearly submitted the F1 liability theory? Absolutely. For damages calculation to the jury? Absolutely. Where does it say that? Where does it say that? It says it in both the judges. If you look at the verdict form, which is on page A201, and the first question is, what's the total amount of worldwide STR kit sales? And that was a stipulated amount. The second question was, what is the total amount of defendant sales of STR kits that were United States sales as that term has been defined for you in the instructions? And page 22 asks you to determine the total dollar value of the defendant's United States sales of STR kits. It reads, what is the total dollar amount of the defendant sales of STR kits that were United States sales as that term has been defined for you in the instructions? And she goes on. United States sales include all kits made, used, offered for sale, sold within the United States, or imported into the United States, as well as kits made outside the United States that are supplied from the United States. Now, that instruction that was given to the jury, which asked them to calculate damages both on a 271A theory and a 271F1 theory, was not a happenstance instruction. The original instruction that was presented to the court said, here are the worldwide sales. Please determine the number of infringing sales. There was an objection by life to that, that infringing sales should be defined under A only, made, used, sold, or offered for sale. We said, no, no, no. There's also F. And the court has held that that issue will go to the jury. Why don't we just define infringement and explain to the jury the two things? That's when the court says, and now I'm quoting from page 6310 of the joint appendix. She says, quote, well, the infringement question has been answered. So I'm not going to explain to them what infringement is. But someplace we've got to get in this concept of how many were of sales of kits that were made in the United States or imported into the United States. And that's how the original question, two of the jury instruction, which said how many of the sales were infringing, said how many of the sales were sales that were made, used, sold, or offered for sale into the United States court. When did the judge say this? At what stage of the trial was this? This was at the jury instruction conference. The quote that I'm giving you is page 6310 of the joint appendix. But the whole colloquy occurs at that time. So it sounds strange that the parties were giving to the jury all these damages questions when it still hadn't been completely resolved whether there was liability under a 271F1 theory? It had been resolved. They specifically asked that the jury not be instructed on 271F. Their 50A motion said importations to the United States are fine if they're not licensed, but everything else shouldn't be presented to the jury. Here are the two reasons why. The judge said, I don't accept those. This question, the question of 271F liability, is going to the jury, and it did. Are you saying right there the judge basically found them liable under 271F1? I mean, there was no finding like that anywhere first, right? The only issue that was presented to the jury by, you know, consistent with the judge's summary judgment ruling, which to be sure didn't raise F1 because they never raised foreign combination in response to that. They're the ones who stood up at opening statement and said there has been infringement. Promega's entitled to be compensated. The only issue is damages. The parties during the trial repeatedly agreed that the only issue before the jury was willfulness and the scope of damages. And I'll cite the court to page 5112, 5167, 5103, and 5107 of the joint appendix for those agreements. The court, again, as I just pointed out, refused to instruct on infringement, quote, because infringement has been answered, no objection. And the judge then told the jury in the jury instructions, I've already found that all the kits defendants sold infringed plaintiff's patent. That's at page 188 of the joint appendix. And the district court judge started issuing some warnings, some verbal warnings to your side. Not at all. There was a lot of doubtfulness of whether or not your damages calculation theory was really appropriate. And then she asked you to take care of it on rebuttal. Well, I'm glad that you raised that, Judge Chen, because there is some confusion in life's briefs about this. In our direct case, we had their corporate witness, Mr. Sanduli, on the stand with all sorts of spreadsheets showing what products were sold where, to whom, what country, what customer, et cetera, et cetera. We started asking him questions about U.S. sales. They objected. They objected on the grounds that this – I can give you the exact page citations of this. They objected – I don't have the right page. They objected on the grounds that that was not an issue in this case. The amount of STR kit sales was stipulated, and so we were not permitted to bring out the extent of the evidence about U.S. sales. In their case, they have the same witness on the stand, and they start asking questions about U.S. sales. We object on the grounds that we weren't allowed to do it. At that point, or shortly after that, we have a bench conference about this, and the judge says, look, you didn't allow them to put this in, and now you want to put it in. Please explain why. They then say, well, the reason is we think they can only claim in essence under 271A, not 271F, and it's their burden to quantify those sales. The judge then says, well, there has been obviously a miscommunication in this case, and that includes me. So now that we've precluded them from putting it on in their direct case, we're going to have to allow them to do that in the rebuttal case, which is exactly what we did with the exact same witness, and that testimony, that evidence, comprises virtually all of volume four of the joint appendix in this case. And our evidence of U.S. sales also included testimony from I think three or four other life witnesses who testified about their own sales of infringing kits to U.S. customers and quantified it. So this wasn't a situation in which we were in any way trying not to do it. We tried to quantify both U.S. sales and worldwide sales, and indeed for the worldwide sales of the identifier kits as to which both the TAC polymerase and the primers were exported from the United States for combination, we quantified it at $311 million. And therefore, even if you were to agree with the court's ruling as to whether or not one component, the court's ruling that one component can never be a substantial portion, we would still be entitled to a new trial on 271F1 for the $311 million in foreign sales of kits that were comprised of multiple components sent from the United States. Okay, I think we'll leave it at that. I'll do my other two points if it comes up in my rebuttal. Well, you've exhausted your rebuttal, but we'll restore you the five minutes of your rebuttal, and then we'll add five minutes, ten minutes to Mr. Reines to keep it sort of even. You don't feel compelled to use that time. Let me first reply on the enablement. There's really two undisputed points right now that I think are determinative in terms of the outcome. One is Promega argued and acknowledged that even as it relates to the 660 patent, which I have now in front of me if you want to look at that, in claim one, it has the same co-amplifying the loci in the multiplex amplification reaction language. And I think it was stated rather proudly that no one's disputing that that's open and encompasses all the loci. So it's not an unrecited. The multiplex amplification reaction includes all loci and primers that are in the multiplex amplification reaction, which is any infinite number of loci, any infinite number of primers. So it's open claim at the point of novelty in C, and that's not disputed. I think you're saying – so the point about whether it's consisting or comprising in the set of loci doesn't matter. That's the point. So I think we're all together on the claim language. Do you think that's the right construction of that claim? I think we took the other position below. All right. It really doesn't matter so much. If it's closed, we don't infringe because we don't use their primers or their loci. We don't use their inventions, for God's sake. So we don't do that. So if it's closed, we don't infringe. If it's open, they're covering stuff that they haven't invented. They haven't given anything to us, which goes to the second point. What else was conceded? I made the argument to you, and I think I was pretty specific and perhaps even repetitive, that if you add a new primer, a new loci to a preexisting set of loci, you might have to start from scratch. Your project's beginning. Uh-oh, we have a conflict. It's all so unpredictable and rare that it works and so hard. It's so trial and error. We have to start over again. We have to go pick all new primers. There was not an effort whatsoever to refute that point because it can't be refuted. We're not talking about pencils and erasers. We're talking about interrelated systems where a new loci brings in new primers that can disrupt everything that happened before. It's interrelated, and so it's now undisputed. They didn't dispute it in their brief. They didn't dispute it in oral argument that if you add one new locus, you maybe start from scratch. That was the language we used in our brief. That's the fact. There's no way someone should be encompassing through this kind of arrangement. Now, I think the important point on that is there's a reason why someone as skilled as my learned opponent didn't make that argument, and that's because of the record and the technology. We're talking about pencils instead of multiplex amplification reaction. At age 715 and 716, their expert, Ballantyne, said one of the most significant problems in adding new loci, so you have a triplex, you're adding a fourth, is the unpredictable interaction between primers. Why is he saying something that would sound friendly to us? Because they're worried about obviousness, and they have to say that every time you add a new locus, you're starting from scratch because you don't know what the primer's going to work. You don't get the benefit of the three. In fact, they take the opposite position. If you have a tenplex and you're adding one, that's more difficult than taking a threeplex. Mr. Reineff, did you have any expert testimony saying that it would take undue experimentation to have— Yeah. I mean, I think we said that it's—here's the point. It's undisputed that they don't enable a fourplex where they have a triplex claim like in the 660 patent. Since we last saw you, did you figure out the whole cross motion for— I didn't. Okay. I was dealing with all the other stuff. I apologize for that. I mean, the record should be clear or we could submit that to you. It comes down to a legal question in my mind because no one's saying that the fourth loci is enabled or that different primers than the primers that are disclosed in the patent are enabled. It's not a debate about—the unrecited, so-called unrecited elements are undisputedly not enabled. They have to take that position. Otherwise, their patents are invalid. It's obvious. There's no factual subject matter here. The question is whether it's encompassed. And then the policy legal question under enablement doctrine is, do we want people to be able to claim open at the point of novelty, which is even worse here than Magsill—and I'll say that and I'll stay to my client in that case— because here you gain nothing from the three—the triplex with those unique primers that happen to work together there because your fourth—if you put four more on, you're going to have conflicts. You're starting from scratch, which is an undisputed fact at this point based on the briefing alone. Why don't you tell us about the cross-appeal? I'd be happy to. Because I assume you don't disagree with Mr. Waxman about a lot resting on the Taos patent, which is not the subject of any of the enablement discussion we've had today. Yeah, let me— Is there an arbitration somewhere about the Taos patent? Yeah, that's resolved and didn't come to fruition in a way that matters. But the point about Taos—and I think there was maybe some misunderstanding here. We're not arguing for this panel to do anything on Taos in terms of awarding us license rights or not license rights. Why would we fill the already large appendix with that? The question was, why does it matter that we clear the commercial playing field of all these invalid Promega patents? And I was giving the practical answer. There's more than enough jurisdictional basis for it to be heard, and I'm giving the background. Why should we lard up the briefs with a long discussion of a 1996 license agreement, which isn't an issue? You have enough on your plates. So why don't I— There's sort of 271F, the two things I'd like to cover, 271F, and then the supposed surprise. Why don't I start with the supposed surprise since we ended there, okay? The idea that Promega thought it was done with its work on showing the quantum of infringement with the summary judgment motion is completely inconsistent with the record, and it's inconsistent with what Judge Crabb said she decided, perhaps the best authority in what she said. When determined—what I think was being employed in the other argument was the ambiguity in the word infringement, which you've all encountered in your long experience in this area, especially some of us have been on the bench for decades. Infringement can mean two things in colloquially the way people use it. It can mean you're reading on, you've got a claim chart where each claim requirement is satisfied, and then people also use it to refer to statutory violations of 271. They're two different things. We all know that. That's not complicated. The summary judgment ruling did not purport to find that there was— much less quantified for all the different products— the amount of or the acts that were infringing. In other words, here's a make, here's a sell, here's a use, here's an import. It wasn't about statutory violations. Judge Crabb was clear about that. But it really doesn't matter because by the time we got to trial, there's no basis whatsoever for Promega to feign surprise that they have to prove infringement and statutory violations. There's foreign sales. It's no shock that you have to prove 271F infringement. And even if there was something in the paperwork pre-trial that caused them to have that confusion, the— What about the jury instruction? The jury instruction is on 271F. It's on ANF. Yeah. Right. I mean, it's flawed in numerous respects, and we preserved all those objections. But yes, the jury was instructed on 271A and 271F. So the judge accepted that jury instruction, giving that jury instruction to the jury. Yes. Yeah, there's no doubt. So the judge was comfortable with giving the question of damages calculation under a 271F1 theory to the jury. True, true, true. And then at the end of the trial, she changed her mind. No, no. No. What happened is there was colloquies where there was confusion, and I'm not sure it matters where they were because it was cleared up. The judge said—and this is at A6190 in the mid-trial—said, because I think clearly plain of thought that it didn't have to put in any more than it already had, and that's not correct. In other words, wait, you've got to prove 271F infringement, and for whatever reason your trial team didn't think you had to. That's undisputable notice. They knew they had to prove their 271F1 case. And I think the thing to do would be just to let you put that all in in your rebuttal case, which was outrageous to my teammates on the life side because, wait, now because they didn't realize they had to prove something, they had to prove they now get the open door to prove anything they want in rebuttal, but that's the way it was, and we had to accept it. That's trial for you. But maybe that's what they were allowed to think because of the jury instruction. That's okay. So then they had to try and prove it up. They were unnoticed. They had to prove it up. Where things went wrong, the problem isn't that there was an instruction that related to 271F. The problem is, most pointedly, at A2488, which was their crafting of the verdict form, the questions they wanted the jury to answer, and their promotion of the conflated jury instruction that mushed A and F together and handled it that way. They wanted to make this, and this is a situation to be deference to the trial judge and respect for what she did in this very large and complex and lengthy litigation, which is they wanted the jury to avert a question that conflated 271A and 271F. I've been to a lot of trials. I've been to a lot of appeals. I've never seen anything remotely resembling that. Frankenstein comes to mind. Okay? They wanted that. We objected. We said this is no way to run a railroad. They can't prove A and F, and then what are we going to do? We attempted to put in U.S. sales numbers to protect ourselves, to say, look, okay, if you're going to find us liable for domestic infringement, we want that. What did she already have on the summary judgment? It was reading on, and she's read the license. I don't think that was it. It's a quantum. It's a sale-by-sale basis. You have to coincide. This sale in the U.S. You have to meet elements to prove a statutory violation, so I don't accept that there were statutory violations shown. You need to do that. She didn't find summary judgment that your U.S. sales were infringing the patent? She found that the claims were satisfied by the technology, and there was U.S. sales, so it wasn't a defense that there's nothing in the U.S. The salient point being that during the trial, we tried to say we are okay being held responsible for our U.S. sales if we're going to do this fair and square if the jury so finds, but we don't want to conflate and mush together the foreign sales because we don't think you're going to be able to prove the foreign sale infringement. So we tried to have our expert point blank. We asked the question of our, not of our expert, of our witness, that said what were the U.S. sales? It was kind of a simple question, and the response that we got from that was an objection on relevance that was sustained at least for the time because the judge was trying to sort out things. We wanted the U.S. sales to be segmented from the app responsible for foreign sales. That shouldn't be covered by U.S. law. They wanted to conflate things and mush them all together and give the jury a, here's the U.S. sales, which is what it is, and here's the number, and it covers both, and you either find that or you don't find anything. I know we want to get to 271, but here's my last question. But sort of the punchline here is that they created a trial record. They created a verdict. Here's my last question, though. Did they hear about Warrington only within one week of the damages trial? Did they hear about Warrington in— Oh, I don't know. I mean, I don't believe so. I mean, it's a discovery. They could have—I mean, it's a fact. If they didn't know about it, it would have been their own fault. There's no suggestion of— Okay. I mean, you have to disclose where your products are made, and there's no sanction that says we withheld. So, I mean, I don't have my fingertips, but it was certainly within the scope of reasonable discovery. But the point being that they selected an all-or-nothing strategy that said lump in the foreign and domestic, and we said, no, because you can't prove the foreign. No, don't mush it together. Separate it out. They wanted a trial strategy. The district judge went through this and said, you know what? You forced me to try this extensive case where you wanted everything lumped together, and the fact that you don't have evidence to prove that brings it all down together. And that's this question about the number of components. They want to start parsing out now on appeal and say, well, we did have this theory where we gave subsets. And what the judge said on the J-MAL when it was pointed out that there was this total verdict and that you didn't have evidence to support the total verdict, you didn't come forward and say, I can prove this segment, I can prove that segment. Their briefs are labored on appeal. This is important, and it's not that straightforward. They spend time trying to say we can trace some money here, we can trace some money there, we can trace some money there to try to salvage some damages out of it after they shot for the moon and lost. And they didn't segment anything out in the trial record. They didn't segment anything out in the J-MAL and say, well, you might take away these sales for identifier but not profiler, and here's our number for profiler, okay. They said we're entitled to everything, and they pursued that in J-MAL. She said you can't do that. You can't run me through a whole huge trial and then a J-MAL process where you're taking the position that it's all or nothing. It's $52 million or nothing. And then when you lose, say, well, we want a do-over. We should be able to show some of our damages. And then appellate court goes through the spreadsheets and put it all together and match the different ones. This is not the way to run a railroad. I'm happy to address 271F, that story. Right. Is it your view that their case rests on an affirmance of Akamai in the Supreme Court? Is there any argument between them in this way? Not at all. I mean, Akamai, I think, is helping. Well, you think they're wrong on inducing yourself, right? There's so many. The first problem they have is the numerosity, which has nothing to do with Akamai. In terms of the number of components. But I think your friend said, and I may be wrong on this, that even to win, they need reversal on both of her arguments on 271F. But to get a new trial, I think your friend said, that if they can prevail on the inducement stuff, they get a new trial. Did I— I just spent ten minutes explaining why. I don't think a new trial is appropriate at all. They took a strategy of shooting for the moon. They never broke anything out. No, I understand. I thought there was a separate argument with regard to that. I'm just saying, that's what— Right, but if somehow they prevail on the law on 271F1 here on appeal— On both prongs. On both prongs. Then they would get to jump into those worldwide sales, right? Because all of the sales were either on 271F1 or 271F1. You're absolutely correct. Now, just to be clear, there is a litany, and I have it— I don't think you need it, but I have it right here— other challenges we have to the verdict that didn't get heard because they were mooted. So then, as I understand Mr. Waxman's argument, if he can convince us about the whole inducing yourself theory, or inducing a subsidiary theory, then all he has to do on numerosity is perhaps get that remanded back for further fact-finding, given that, okay, maybe in some instances it's just a single component, the tax polymerase. But in other instances, there's a kit with multiple pieces to it, and so that could satisfy the substantial portion of the components element of 271F1, even if we were to say that you have to have more than one component to satisfy 271F1. That was a long question. You want to be brief, though, in the response, if you can. I understand that's the argument. I think that the all or nothing, I think the trial judges already said that they had an ability to parse things the way they wanted to parse them. If they wanted to quantify this issue and raise it in the J model that protects the multiple components that have been proven to the district judge, they could have done that. They didn't do it. So I don't agree at all that there's a new trial right in these circumstances, and that wouldn't be, for me, that's really something for the district judge, who's already stated what he's going to do on that, which is, no, they made a conscious choice to shoot for the moon with respect to 271F, with respect to numerosity, with respect to everything, knowing full well what the risk of that was, and to ask the process to start over again is totally inappropriate and disrespectful to the district judge. I think we have your argument. Thank you. And we're going to hold her to it. Okay. I'm going to stick to it. The point here, a lot of this discussion has gone to the supposed inequity or impropriety in a new trial in this case. Nothing could be further from the truth. The judge denied our motion for a new trial because she found that it had been waived because we hadn't asked for it in the alternative in response to their Rule 50B motion. We pointed out to her that under Rule 50D, which is absolutely pellucid about this, a verdict winner has until 28 days after an adverse chain wall to move for a new trial. She didn't recite that or acknowledge it in her denial of a new trial motion. Life doesn't even cite Rule 50D. That is clear error, and we are entitled to a new trial. Now, I do want to get into, I hope that I'll have a few seconds to get into the 271F damages on the identifier kits because it's not as if we want to have the right to go back and show that both the polymerase and the primers were supplied for $311 million of sales. The judge found that. She acknowledged that in her J-Mall ruling. That's an accepted fact. But more directly to the point, two things. First of all, they moved for J-Mall not on non-infringement. How could they? They stood up and told the jury that there was an infringement and we were entitled to be compensated for it. Their 50B motion was on damages. They claimed that we had this all or nothing theory, and since we didn't prove all, we had to be stuck with nothing. The notion that in ruling on a damages motion, the court could enter a judgment of no infringement on the record in this case is completely indefensible. And even if there had been a flaw in the damages award in light of the judge's J-Mall ruling on 271F, there is no question under the law of the Supreme Court, the law of this circuit, and the law of every other court that the proper remedy would be an offer of remediator or a new trial. That is the rule when one of multiple theories is subsequently determined to be invalid. It is the rule that the Supreme Court in Hetzel and this court, I think in I'm forgetting the name of it now, has held the Seventh Amendment requires when there is proof of at least some damages, a new trial is required. A court is not allowed to say you didn't prove all of it, therefore you get none of it. And here, the evidence on 271A is nothing short of overwhelming. I've already mentioned everything that's in Volume 4 of the Joint Appendix here. If you just look at pages 14 through 18 of our opening brief in this case, you will see as concise a recitation as we could provide for the extensive evidence of quantified, acknowledged U.S. sales of infringing goods here. And that included multiple life witnesses' own testimony. And the notion that Mr. Reines is suggesting here that all we did was try and lay a bunch of spreadsheets in the record so that the jury could somehow figure this out is, as we point out in our red brief, more than ironic because they raised the issue before trial with the judge. They did not want testimony about what was in those spreadsheets on the record in the case because they considered it confidential. And as a result, the judge provided that we would have their witness on the stand who would describe what the spreadsheets were and explain to the jury how it could, in fact, sum up the damages. Why didn't you supply all of that evidence about U.S. sales you gave to us to the district court judge in opposition to the J-mall? That's exactly what happened. That's exactly what happened. What happened was, and I actually do have the pages for Your Honor about the page size for what exactly happened when. On day four of the trial, we had this witness, Mr. Sanduli on the stand, asking him about the spreadsheets showing lice sales, including U.S. sales. They objected because the evidence was not relevant to any issue before the jury. That's at page 5572. Two days later, they had Mr. Sanduli on the stand. They asked him to quantify U.S. sales. That's at 6126 and 6127. We had a sidebar where we said they wouldn't let us do this exact same thing with them. At the next break on the same day, there was this key colloquy. That's at page 6184 to 6191, where the court recalled that Life had previously objected to the evidence of U.S. sales, saying, quote, when there was an effort to get into that, the agreement was we didn't need to. And then the court said, okay, now I understand Life's point. Quote, well, I think there's a miscommunication between counsel, and that included me. I think clearly the plaintiff thought that it didn't have to put in any more than it already had, and that's not correct, and I think the thing to do— I think we can read it. Okay. And if you look at all the citations of this groaning table of proof about infringing U.S. sales and the quantity of it, it is almost all after that page, 6190 of the transcript, where the judge said, okay, thank you. Your Honor, that was the first argument for 60 seconds. There's one case that I just want to highlight in response to an argument that was not rebuttal at all. I don't think we can do that here. If you want to submit something to the court for perhaps our review, I just don't think it's appropriate here to get an additional argument at this point in time. We thank both parties, and the case is submitted.